IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

KEHINDE BALOGUN,

                              Plaintiff,                    OPINION AND ORDER

        v.                                                  18-cv-301-wmc

THE BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
KEVIN CHEREK, and BOBBY BURROW,

                              Defendants.

        Alleging discrimination based on race and national origin, as well as retaliation for

complaining about discrimination, a former employee of the University of Wisconsin-

Madison, plaintiff Kehinde ("Tony") Balogun, filed this lawsuit against his former

supervisor, Kevin Cherek, Cherek's supervisor, Bobby Burrow, and the University's Board

of Regents.  Before the court is defendants' motion for summary judgment.  Because there

is enough evidence from which a reasonable jury could at least find for plaintiff on his

retaliation claim, defendant's motion will be denied in part and reserved in part.[1]


                              UNDISPUTED FACTS[2]


  **A.  Background**

        Tony Balogun is a black man from Nigeria with an extensive educational and

professional background in computers.  Following a statewide recruitment effort, Balogun

was appointed as an "IS Resource Support Technician Senior" at UW-Madison in the

---

[1] Also before the court is plaintiff's motion to strike Cherek's supplemental declaration.  (Dkt. #51.)
For reasons discussed below, that motion will be denied.

[2] Except where noted below, the following facts are material and undisputed for purposes of
summary judgment viewed in the light most favorable to plaintiff as the non-moving party.

Division of Facilities, Planning and Management ("FP&M"), effective April 23, 2007. As an IS Resource Support Tech Senior, Balogun held the highest level title in his "series," meaning he could not be reclassified or promoted without applying and interviewing for a change in series. The posted position summarized his major responsibilities as: (1) "answering computer related support request call[s] from FP&M IT customers"; (2) "resolving problems reported via the calls and entering and updating call status in our call management system"; and (3) "installing, moving and removing computer hardware and peripherals on FP&Ms managed clients and ensuring that the physical devices installed matched the inventory." Balogun's prior work experience largely overlapped with his responsibilities in this new position.

When he started, Balogun's position was in the 6-14 pay range, for which he was paid $16.756 per hour. At that time, Wayne Bradley and Kate Mutchler -- who are both white -- were also on the desktop support helpdesk. As an "IS Network Service Senior," Bradley was responsible for providing advanced level support for servers and desktops, for which he was paid $28.572/hour.[3] Also an IS Tech Service Senior, Mutchler was paid $21.899/hour. At the end of 2007, Balogun asked his supervisor Cherek, who had participated in his hiring, to reclassify his job because he was doing the same work as Bradley and Mutchler. Cherek informed him that he could not be reclassified. Balogun appeared to accept that response until January 2009.

After the University of Wisconsin System consolidated various information

---

[3] In 2010, Bradley transferred to an "IS Technical Services Senior" position to align with his job responsibilities. In 2011, Travis Harvey, another white man, was hired as an "IS Resource Sup Tech Entry, LTE." On June 11, 2012, Harvey became a permanent "IS Tech Serv Prof."

technology departments in 2008, FP&M became known as Administrative Information Management Services ("AIMS"). Balogun then served on the customer services group in the operations and support services subdivision of AIMS. During this time, when manning the helpdesk, Balogun was responsible for addressing calls, although the parties dispute precisely which calls were his responsibility. The parties agree that Balogun handled approximately 2,000 calls between 2007 and 2009, when he ceased working at the helpdesk.[4]

More specifically, during this timeframe, Balogun, Bradley and Mutchler handled the following number of calls:[5]

| 2007 | | | | |
|---|---|---|---|---|
| | Calls Handled | | Diary Notes | |
| | Search Result | Calls Handled (owner) | Search Result | Calls Handled |
| Balogun | 635 | 630 | 659 | 631 |
| Bradley | 527 | 501 | 553 | 521 |
| Mutchler | 788 | 663 | 770 | 631 |

[4] While plaintiff contends he documented every call, his performance reviews fault him for failing to do so at times. If this criticism were true, it cuts both ways since it also suggests he handled an even greater number of calls as compared to his closest comparators.

[5] Plaintiff represents that this call summary was drawn from Applix records concerning the number of calls that he handled compared to two of his co-workers on the helpdesk from 2007-2009. (*See* Willems-Neal Decl. (dkt. #34) ¶¶ 3, 5-7.) AIMS utilizes the tracking software Applix for helpdesk workers to document customer calls, including the time, caller, problem, solution, and the timing of the solution. While defendants argue Willems-Neal's declaration does not sufficiently detail the bases for these proposed summaries, this could have been easily addressed by asking for the underlying data pursuant to Federal Rule of Evidence 1006. Since this was apparently not done, the court will accept these summaries for purposes of the present motion only. Of course, defendants are free to challenge their admissibility after inspecting the underlying data or to offer contrary evidence at trial.

| 2008 | | | | |
|---|---|---|---|---|
| | Calls Handled | | Diary Notes | |
| | Search Result | Calls Handled (owner) | Search Result | Calls Handled |
| Balogun | 753 | 750 | 902 | 750 |
| Bradley | 836 | 795 | 888 | 795 |
| Mutchler | 750 | 649 | 748 | 648 |

| 2009 | | | | |
|---|---|---|---|---|
| | Calls Handled | | Diary Notes | |
| | Search Result | Calls Handled (owner) | Search Result | Calls Handled |
| Balogun | 641 | 636 | 1639 | 636 |
| Bradley | 586 | 540 | 891 | 540 |
| Mutchler | 194 | 139 | 268 | 139 |

On January 7, 2009, Cherek emailed the AIMS Operations and Support Services staff to "clarify a few things" relating to Applix, including that "[t]he person who takes the call is responsible for its resolution." (Jan. 7, 2009 Email (dkt. #35-3) 1.) The next day, Balogun went to Cherek to point out that his email showed Bradley and he were doing the same work, supporting his position that he should be reclassified. Cherek again disagreed and denied the request. Within days of this exchange, Cherek began criticizing Balogun's performance via email.[6]

On July 20, 2009, Cherek removed Balogun from the helpdesk. While there is disagreement about what motivated this decision (*compare* Balogun Decl. (dkt. #35) ¶ 48 *with* Cherek's Log (dkt. #35-6) 2), Balogun told Cherek at the time that he suspected it was because of his minority status.

---

[6] Although not memorialized until January 12, 2009, defendants contend that Cherek's criticism was first addressed in a conversation with Balogun on January 6, 2009, the day *before* Balogun revisited his request for reclassification. (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #46) ¶¶ 48-49.) Although no formal reply to defendants' response is called for under the court's summary judgment procedures, Balogun presumably disputes this given his original assertion.

Less than two months later, on September 17, 2009, Cherek divided the customer services group into two teams: incident and field services. The incident team manned the helpdesk, while the field services team handled service requests. Cherek explained that the teams were based on position, so that those with higher level titles and salaries were assigned to the incident management team. In contrast, Balogun was assigned to the field services team with other lower-level titled staff members, while Bradley and Mutchler went to the incidents team. In justifying this decision, Cherek explained that Balogun's position was never intended to be a higher level one, and that Balogun had been assigned higher level work because of staffing shortages. While Balogun remained an IS Resource Support Technician Senior, the amount of time he devoted to major responsibilities changed.[7] Balogun was the only non-student, non-supervisory employee on the field services team, as well as the only minority on that team. Balogun was insulted by his assignment.

Four days after Cherek announced the division of teams, he met with Balogun to discuss the teams' staffing further. In that meeting, Balogun explained that he felt disrespected by Cherek for not having a separate meeting at the outset, and he further found Cherek's open discussion of everyone's salary and title demoralizing, degrading and demeaning. Cherek responded that this information was publicly available and was not meant as a put down. Balogun also claimed that he felt taken advantage of over the last 2.5 years, adding that his placement as the only minority on the field services team seemed racially-based. Balogun also asked why someone from the incident team was the field

---

[7] A change in an employee's duties did not necessarily lead to a change in the employee's title, although an employee's title may change when his permanent duties have shifted away from the job's original functions. In particular, if 50% or more of the duties has changed, recruitment is required because that is considered a new position.

services team's lead, to which Cherek responded that that the people with higher-level titles were appropriate leaders. Finally, they discussed and disagreed whether Balogun was having trouble on the helpdesk.

On October 1, 2009, Cherek and Balogun discussed race issues in the office, during which Balogun stated that he took issue with how the unit was being structured and he planned to speak with a union steward. According to Balogun, Cherek attempted to demote him to a Field Service Technologist position around that time, and when asked why, Cherek said "because we can do it." Cherek disputes this as well. (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #46) ¶ 76.) The parties also disagree about what happened at a November 30, 2009, meeting about Balogun's job description. (*Id.* ¶ 77.) However, there is no disagreement that the time Balogun spent on specific tasks did change in late 2009.

On October 2, 2009, UW-Madison sought applications for a vacant, permanent IS Technical Services Senior position. After Balogun told Cherek of his intention to apply, however, that position was cancelled, an action defendants attribute to budget cuts but Balogun argues could be construed otherwise. (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #46) ¶ 81.) Regardless, Cherek posted the position later as a temporary position and Balogun chose not to apply because he could lose his civil service classification if the position did not become permanent. Ultimately, two individuals were hired to IS Technical Professional project positions, one of which became a permanent position.

## B. Formal ERD Complaints

In light of these developments, Balogun filed an ERD complaint with the Wisconsin Department of Workforce Development on February 22, 2010, alleging that UW-Madison

had discriminated against him based on national origin and race by: (1) paying him less than similarly situated white coworkers; (2) refusing to reclassify him to a higher job, even though a similarly situated white coworker had been reclassified; and (3) changing higher level permanent job postings to temporary positions to prevent him from applying. Balogun filed a second complaint on October 6, 2010, alleging that Cherek retaliated against him for filing the first complaint by: (1) criticizing his work; (2) issuing a written reprimand on April 27, 2010; and (3) suspending him for a day.

The ERD returned initial determinations of "no probable cause" in both cases on May 17, 2011, which Balogun appealed. Those cases were later consolidated and hearings held on April 18 and June 7, 2012, at which five people testified, including Cherek, Burrow, and Balogun. The ERD issued its decision on January 30, 2013, concluding that Balogun had not shown probable cause to believe UW-Madison violated the Wisconsin Fair Employment Act and dismissing both complaints. After the Labor and Industry Review Commission affirmed that decision with minor modifications on April 11, 2014, Balogun timely sought judicial review. Finally, on September 24, 2014, the Dane County Circuit Court issued an oral ruling affirming and dismissing the petitions for review.

### C. Balogun's Work Performance & Disciplinary History

Throughout Balogun's employment, Cherek served as his supervisor and completed Balogun's performance evaluations. Before the period starting on May 1, 2013, Balogun's overall performance was rated as satisfactory, although earlier evaluations noted concerns about difficulties he had accepting the team leader, focusing on details, and knowing when to consult senior technicians. Only after filing his ERD complaints did Balogun begin to

receive a number of formal disciplinary actions. On April 27, 2010, he received a written reprimand for not following instructions after failing to recognize and inform his team leader when he was unable to complete an installation in one trip. On July 29, 2010, he also received a one-day suspension for violating the same rule -- this time for refusing to provide requested information to his team leader in a timely fashion. This suspension followed an email from Cory Chancellor asking Balogun what he was working on and Balogun responding that his assignments could be seen on the Applix system. Cherek asked Balogun to email that information to Chancellor, which Balogun did, cc'ing Cherek within 24 hours.

Balogun next received a three-day suspension on March 7, 2011, for again violating the same work rule, but this time for insubordination because he failed to attend a field services team meeting. Balogun acknowledges skipping that meeting, believing it was degrading to work with students instead of peers in terms of education and age. He received yet another one-day suspension on January 29, 2013, for insubordination after refusing to assist with an assigned task -- unloading a shipment of computers. Again, he felt that as the oldest, most senior member of the team -- and the only minority -- he should not have been asked to perform the task, especially with student workers available to do it instead.

On September 12, 2013, Balogun was once again suspended for failing to provide accurate/complete information when requested and for negligence in the performance of his duties. The September 12 disciplinary letter explains Balogun delivered a laptop to Peter Hoonakker that was not fully configured, resulting in Hoonakker asking someone else to complete the task. Additionally, when Balogun moved several computers to a

different work group, two proved unusable because they could not access the network, resulting in a request that Balogun not work on their projects in the future. (Sept. 12, 2013 Letter (dkt. #25-1) 27.)[8]

Despite ongoing issues since 2010, it was not until Balogun's evaluation for the period May 1, 2013, through June 30, 2014, that his overall performance was rated unsatisfactory. That evaluation is dated September 25, 2014 -- one day following the Dane County Circuit Court's affirmance and dismissal of Balogun's administrative claims for discrimination and retaliation. In particular, this evaluation noted that Balogun struggled to notify his team lead when facing problems he could not resolve, was being outperformed by students, failed to follow established procedures, declined to use available resources, and failed to keep the call tracking application updated. Not surprisingly, plaintiff disputes the accuracy of this annual evaluation.

On September 26, 2014, Cherek and Balogun met to discuss the evaluation, although they strongly disagree about the substantive discussion at that meeting. Balogun contends Cherek told him that: (1) his career at UW was over, so if he wanted to get ahead, he should leave; (2) he was being placed on a concentrated improvement plan that would involve monthly meetings with Cherek and HR; and (3) Cherek was going to increase his own scrutiny, meeting with him every week. Cherek disputes making any of these statements. (Balogun Decl. (dkt. #35) ¶ 109; Cherek Suppl. Decl. (dkt. #48) ¶¶ 2,

---

[8] Balogun contends that he moved the desks to the desired location only to discover that the internet jack was not activated. While waiting for the jack to be activated, he ran a cable across the floor. Balogun contends that the customers did not complain, but that their supervisor was Burrow's wife, and *she* asked that he not come back. (Balogun Decl. (dkt. #) ¶¶ 97-98.) Balogun points out that this is the only discipline he received relating to his technical duties.

4-6.)[9]  The parties further disagree whether Balogun asked for -- and whether Cherek had any -- proof that Balogun was being outperformed by students.  (Balogun Decl. (dkt. #35) ¶ 116; Cherek Suppl. Decl. (dkt. #48) ¶ 8; *see generally* Performance Tracking Spreadsheet (dkt. #48-4).)

The parties agree that during this September 26, 2014, meeting, Balogun and Cherek discussed a goal for Balogun of delivering 10-12 computers a week.  Balogun contends he protested, asserting that such a goal was impossible and adding that 4-5 computers was more reasonable, and even then, only when a major project was underway.  Defendants contend that Balogun only questioned whether he could deliver 10 computers a week.  (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #46) ¶ 127.)  Relatedly, defendants contend that Balogun and Cherek had agreed back in January 2009 that building a computer should take no more than one business day, but on average only 3-4 hours.

Regardless, the parties agree that Cherek gave Balogun an unsigned copy of the evaluation to add rebuttal comments, which he did.  Evaluations are normally signed by the supervisor and scanned into a personnel file.  When Balogun returned the evaluation

---

[9] Relatedly, plaintiff has filed a motion to strike Cherek's supplemental declaration under the sham affidavit rule, arguing that Cherek previously testified that he did not recall the specifics of the conversation and the declaration failed to explain what refreshed his memory.  (Mot. Strike Br. (dkt. #52) 4-5.)  In opposition, defendants explain that Cherek found additional documents that refreshed his recollection.  (Mot. Strike Opp'n (dkt. #55) 1-3.)  "Only when the changed testimony is 'incredible and unexplained' may courts disregard the affidavit, because when the change is 'plausible and the party offers a suitable explanation,' the fact of contradiction 'affects only [the testimony's] credibility, not its admissibility."  *Arce v. Chic. Transit Auth.*, 311 F.R.D. 504, 510 (N.D. Ill. 2015) (citing *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996)); *see also EEOC v. Aurora Health Care, Inc.*, 12cv984JPS, 2015 WL 2344727, at *5 n.28 (E.D. Wis. May 14, 2015) ("[The witness's] general lack of memory at a specific time is not specifically contradicted by her later memory.  Indeed, that is often the nature of memory.").  As such, the court will not strike the declaration.  Of course, plaintiff may challenge Cherek's credibility as to his purportedly recovered memory at trial.

and his rebuttal, Cherek said that he would meet with human resources to review it. Balogun did not hear anything and was not provided a copy of the signed evaluation. A concentrated improvement plan was not implemented and there were no weekly meetings with Cherek. On February 23, 2015, Balogun requested a copy of his personnel file. He received a complete copy of his file, which did *not* include his September 2014 performance evaluation, although the personnel file now contains this evaluation and rebuttal.

### D. Balogun's Layoff

Under UW policy, a "layoff" occurs when a staff member's employment is terminated due to a lack of funding, organizational change or work shortage; such a termination may not address misconduct, poor attendance, or inadequate performance. Typically, the first step in evaluating a proposed layoff involves assessing whether the organization requires the existing functions. Employing units also can consider job-related standards. Next, the employing unit prepares a comprehensive, written layoff plan, which it provides to human resources for review. After the human resources department approves the plan, permanent staff designated for layoff are entitled to written notice at least 60 days before the layoff date. Even following a layoff, permanent employees retain certain rights to reinstatement or consideration for open positions, although the parties seem to disagree about the specifics.

In August 2014, the UW-Madison Administration issued a memorandum concerning the University's $23.5 million budget shortfall for the 2013-2015 budget and asking for proposed budget plans that included fiscal cuts. Among other things, AIMS submitted a plan indicating that it would not fill a vacancy for an office assistant and

identify a position for termination to meet the remaining $37,000 gap.[10]

The UW-Madison Administration issued another memorandum in February 2015, this time concerning the governor's proposed $300 million cut to the 2015-2017 budget for the University of Wisconsin System as a whole. The administration asked for budget plans to implement 4.5% cuts by July 1, 2015, and an additional 2% by July 1, 2016, acknowledging the likelihood of layoffs or unfilled vacancies. A few days later, Burrow asked Cherek and Heacox to consider potential layoff strategies. Cherek and Heacox initially thought that all funding sources should be considered for achieving the budget cuts, so they recommended laying off the two employees with the least seniority -- Balogun and a Caucasian female from the development services unit. Cherek believed laying off Balogun would have the smallest impact on AIMS's customers, given the anticipated implementation of virtual desktops and his belief that Balogun's work could be handled by students. In contrast, Cherek considered the other positions to be critical.

Ultimately, the only positions impacted by the cuts were those funded by General Program Revenue ("GPR" or "101 funds"). The salaries of limited-term employees ("LTEs") and development services unit employees do not impact the permanent 101 budget. Accordingly, they were excluded from the final layoff plan.

A March 27, 2015, layoff plan identified Balogun as the only IS Resource Technician Senior to be laid off. The plan was approved and overseen by Kathy Mathers, the director of administrative services. On April 29, 2015, Balogun received a letter from Cherek informing him of the decision to lay him off in 60 days. Balogun's last day of work

---

[10] Despite this, on September 22, 2014, Gary Gabus was hired to fill an IS Tech SRV Senior position in AIMS.

was June 26, 2015.  He was the only person laid off and the only non-white, full-time permanent employee.  He also had more seniority than Chancellor who was the field services group's team lead and only permanent employee besides Balogun.

Around the time that Balogun was laid off, AIMS had an active recruitment for an IS Technical Services Senior on the Server Team to replace an existing position.  Balogun asked HR if he could apply for this position.  He was informed that the position was closed and that there was no way for him to apply anymore.  UW-Madison hired Andrew Briggs as a temporary employee on July 1, 2015.

### E. Post-Layoff Recruitment Efforts

#### 1. Position 96512

Hiring supervisor Diana Rogers submitted a request to fill an IS Technical Services Professional position in July 2015.  The position had a fixed end date of August 8, 2016.  Human Resources approved, validated and posted the position around August 31, 2015.  Position 96512 was posted with the title "IS Network Support Technician."  There appears to be no dispute that, at the time, AIMS did not provide network services and did not employ anyone with that title.

The parties dispute whether this position should instead have been posted under the title "IS Tech Services Professional."  (Pl.'s Resp. to Defs.' PFOF (dkt. #29) ¶ 78.)  While Cherek contends that the human resources department advised him and his team not to worry about the posting's title, plaintiff points to the deposition testimony of Meghan Owens in human resources that before posting an open position, she verifies that "the title is appropriate for the job description," and the title is "appropriate to what the

org structure is."[11]  (Cherek Decl. (dkt. #24) ¶¶ 45-46; Owens Dep. (dkt. #38) 10:9-11:16.)

As posted, Position 96512 was in a different title series from Balogun's former position.  The parties agree that the position's working title was "Desktop Support / Help Desk," such that the hired employee would devote 60% of his time to helpdesk, workstation, application and customer support.  The position description provided that the employee would be responsible for providing "advanced level phone support for AIMS support help desk" and "all levels of customer support."  (96512 Job Description (dkt. #25-3) 2.)  The position was classified as Schedule - Range 06-13, with a payrate of $16.601-$27.557.

Balogun applied for this position on September 9, 2015, and Cherek, Heacox, and Rogers conducted eight, 15-minute telephonic interviews for the position, including one with Balogun.[12]  The interviewers determined that Balogun did not have the communication skills required for the position.  (Cherek Decl. (dkt. #24) ¶ 50; Balogun Phone Interview Notes (dkt. #25-3) 11-15 (noting unclear answers).)  Plaintiff disputes this conclusion, contending "[h]e has an accent, but he does not lack communication skills" and that his earlier evaluations "demonstrate he did not lack communication skills." (Balogun Decl. (dkt. #35) ¶ 155; 2008 Performance Evaluation (dkt. #25-1) 7 ("Tony communicates well with customers and staff.").)  During his interview, Balogun stated that

---

[11] Additionally, in disputing that the position was improperly titled and that human resources advised Cherek's team not to worry because the title would be corrected plaintiff states: "Neither the job title nor classification were changed prior to offering the position to Daniel Stickels" but provides no evidentiary support for this assertion.  (Pl.'s Resp. to Defs.' PFOF (dkt. #29) ¶ 79.)

[12] Twenty-seven individuals applied for the position and human resources recommended including Balogun as the eighth interviewee.

he resolved customer issues by phone while working for AIMS and that he had no performance weaknesses that had been brought to his attention. While Balogun had not been assigned to the helpdesk incident team for several years before being laid off, Cherek had counseled Balogun about performance issues in the past, and he considered Balogun's interview statements to be inaccurate. Regardless, the interviewers considered Balogun unqualified and did not recommend him for a second round of interviews. Plaintiff disagrees with this conclusion. (Pl.'s Resp. to Defs.' PFOF (dkt. #29) ¶ 86.)

At the end of his interview, Rogers told Balogun that she would contact him by the following Tuesday. When he did not hear from her, he called Rogers. On the phone, she informed him that human resources was going to make the hiring decision. On October 12, 2015, Rogers emailed Balogun telling him that the review and interview process was taking longer than anticipated, but that he would be notified of the final status by the end of the month. On October 28, 2015, Balogun received an email informing him that the position had been cancelled, but that a new search may open in the future. The position had actually been offered to another candidate, who declined the position on October 4, 2015.

## 2. Position 97093

A new IS Tech Services Professional position, 97093, was also posted in October 2015. Like Position 96512, it was in a different title series and a higher classification (7-35) than the position Balogun had when he was laid off. Still, the job description was nearly identical to the job description for the prior, cancelled position. Balogun applied for this position as well.

When reviewing the thirty applicants for the 97093 position, Cherek and Rogers ranked Balogun tenth. Cherek attributes this to Balogun's "lack of experience resolving intermediate-to-advanced hardware, software, and application problems for customers." (Cherek Decl. (dkt. #24) ¶ 55; 2008 Performance Evaluation (dkt. #25-1) 7 ("Tony possesses the basic knowledge necessary to provide first level customer support for our hardware and software."); *id.* at 9 ("[S]ometimes he waits too long before consulting senior technicians when he runs into problems").) Once again, Balogun contends that he "regularly handled and resolved advance level problems" and "handled the calls as they came in regardless of the level of difficulty and sought assistance from others if [he] believed [he] needed it." (Balogun Decl. (dkt. #35) ¶¶ 153-54.)

Ultimately, the top five candidates were interviewed, resulting in a job offer to Dan Sanger, who had experience working at a helpdesk and in technical roles. In contrast, Balogun received a letter informing him that he was not qualified for this position.

OPINION

Summary judgment is appropriate where the moving party establishes "that there is no genuine dispute as to any material fact," and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, evidence is viewed "in the light most favorable to the non-moving party," but the "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence." *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) (citing

*Abdullahi v. City of Madison*, 423 F.3d 763, 769, 773 (7th Cir. 2005)).[13]

As a preliminary matter, defendants contend that some of plaintiffs' claims were already litigated through state proceedings. Specifically, defendants contend that

> the Dane County Circuit Court issued a decision affirming the administrative decisions that UW-Madison did not discriminate or retaliate against Balogun when (1) a Caucasian staff member, Wayne Bradley's position changed and Balogun's did not; (2) Cherek revised Balogun's position description in 2009; (3) Balogun was not promoted to another title series . . .; (4) Balogun was paid less as compared to staff members; and (5) Balogun was disciplined and reprimanded on April 27, 2010.

(Defs.' Opening Br. (dkt. #28) 23.) While plaintiff acknowledges that his "ERD complaints were extensively litigated," he perplexingly fails to address defendants' claim preclusion argument.

Still, the ERD lacked jurisdiction to consider -- much less decide -- his federal claims for the time period preceding his complaints. *See Staats v. County of Sawyer*, 220 F.3d 511, 516 (7th Cir. 2000) ("The Equal Rights Division's jurisdiction is limited; it can hear claims brought under WFEA but not the federal anti-discrimination statutes. . . . Thus, it was impossible for [plaintiff] to raise his federal claims in addition to his WFEA claims in his action brought before the Equal Rights Division."); *id.* at 517 (reversing grant of summary judgment on claim preclusion because plaintiff was "not precluded from bringing his federal claims in another forum"). Accordingly, the court will focus its analysis at summary judgment on the evidence supporting plaintiff's discrimination and retaliation claims under

---

[13] In the Seventh Circuit, courts apply the same standards to Section 1981 and Title VII discrimination and retaliation claims at summary judgment. *See Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013); *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) (citing *Smiley*, 714 F.3d at 1002).

§ 1981 and Title VII.

## I. Discrimination

Title VII prohibits employers from discriminating "against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In an employment discrimination case, the question at summary judgment is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action[,]" with "all evidence belong[ing] in a single pile and . . . evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016). Put another way, "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Board of Trs. Of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Here, the answer is likely no.

Defendants frame their summary judgment argument in terms of the *McDonnell Douglas* framework (Summ. J. Br. (dkt. #28) 30-31), while plaintiff's opposition purports to eschew that analysis.[14] Instead, plaintiff identifies specific disparities on which he bases his discrimination claim: (1) the pay gap between Balogun and his white colleagues on the helpdesk; (2) Cherek's refusal to reclassify him, despite white coworkers being reclassified; (3) Balogun's assignment to the field services team, while his white colleagues were assigned

_____

[14] Recognizing that plaintiff belongs to two protected classes and that his layoff qualifies as an adverse employment action, defendants argue that plaintiff (1) cannot identify any similarly situated employees outside his protected classes and (2) he cannot show that he was meeting his employer's legitimate employment expectations. (Summ. J. Br. (dkt. #28) 30-31 & n.106.) While plaintiff chose not to adopt the *McDonnell Douglas* framework in response, as discussed below, he does in fact propose two similarly situated employees and maintains that he was meeting (if not exceeding) all reasonable employer expectations.

to the incident team; (4) higher level jobs being posted as temporary positions to discourage his application; and (5) reliance on his accent to disqualify him from being rehired. (Opp'n (dkt. #50) 38-39.)

Although there is certainly conflicting evidence, a reasonable jury might infer that Cherek treated Balogun differently than his white colleagues and impeded his career by: (1) declining to reclassify him; (2) removing him from the helpdesk; (3) placing him on the field services team; and (4) posting higher positions as temporary to discourage Balogun from applying. In particular, plaintiff has presented evidence, albeit disputed by defendants, that he was doing the same work as his two most comparable white colleagues, yet was in a lower classification -- with lower pay -- despite asking for reclassification on at least two occasions. In fact, plaintiff contends that one of his identified comparators lacked higher-level skills, as recognized by Cherek. (Opp'n (dkt. #50) 38 (citing Pl.'s Add'l PFOF (dkt. #32) ¶ 46); Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #46) ¶ 46.) Additionally, there is a dispute whether a different white male (Travis Harvey) was reclassified or if he applied for the higher position before being promoted to a different title series.

Next, plaintiff was not only removed from the helpdesk, despite the fact that he appears to have handled more calls than his white, better-paid colleagues, but then was singled out for an apparent demotion into a group consisting of only student workers, a supervisory employee, and Balogun. Also, on at least one occasion after Balogun expressed interest in applying for a higher position, it was cancelled and replaced with a temporary one, eventually resulting in the hiring of another individual into a position that later became permanent. Finally, as discussed in more detail below, the reasons for disqualifying plaintiff for the 96512 Position were suspect.

19

Still, plaintiff's proof of discrimination animus is exceedingly thin, principally because his claim largely turns on the strength of two comparators -- Bradley and Mutchler -- and Cherek's arguably favorable treatment of them over Balogun for a number of years, resulting in his removal from the helpdesk altogether, his assignment to a student-comprised team, and his eventual layoff.   Plaintiff avers that both comparators were effectively doing the same job, but he has not refuted that both had seniority over him from the start of his employment.   Nor has he presented any evidence that either Bradley or Mutchler had similar issues with respect to their performance (a consistent problem for Balogun from almost the beginning of his time on the helpdesk was his claimed failure to enlist the assistance of a more senior technical expert sooner) or similar "satisfactory" annual performance reviews.   A jury is then left with evidence that Cherek refused to reclassify (or pay) Balogun similarly to his two white comparators despite what plaintiff claims was comparable or even superior work, and Cherek's eventual decision to effectively demote Balogun and ultimately lay him off as the least critical employee, the latter occurring shortly after dramatic budget cuts.

While Cherek *may* have been motivated by the differences in Balogun's race or country of origin, he may also have been motivated by Balogun's seemingly underwhelming performance, a lack of seniority and, ultimately, budget constraints.[15]   On this record, the

---

[15] Plaintiff appears to argue that the disciplinary actions he received were excessive, as he was written up for not informing the team leader that he could not complete an installation in one trip and suspended for telling his team lead to see his projects on Applix, declining to attend a meeting with students, and refusing to unload computers while younger students were available.  *See Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999) (recognizing that pretext can be established by showing that the employer's purported reasons were insufficient to motivate the adverse employment action where the severity of the adverse action is incongruous to the alleged infraction -- such that the employer is "swatting a fly with a sledge hammer").

court's concern is that, at best, a jury would have to guess as to Cherek's actual motivation, and if so, then plaintiff has not met his burden of proof. That concern is only heightened by plaintiff's haphazard briefing on his discrimination claim. With genuine disputes as to Balogun's job performance as compared to his two closest comparators, and the fact that a trial is necessary with respect to his retaliation claim, the court may nevertheless allow his discrimination claim to proceed as well. At this point, however, the court will reserve on defendant's motion for summary judgment with respect to his discrimination claim. In his pretrial submissions, plaintiff should provide *any* case law allowing a discrimination claim to proceed where the plaintiff is the only member of his protected class, as well as provide the performance evaluations of his two comparators. Otherwise, plaintiff's discrimination claim is unlikely to survive to trial.

## II. Retaliation

A plaintiff can prevail on a retaliation claim only if he proves that he: "(1) opposed an unlawful employment practice under Title VII; (2) was the object of an adverse employment action; and (3) the adverse employment action was caused by [his] opposition to the unlawful employment practice." *Congleton v. Oneida Cty.*, No. 16-cv-412-wmc, 2017 WL 4621117, at *16 (W.D. Wis. Oct. 13, 2017) (citing *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000)). This requires the plaintiff to have complained about discrimination based on membership in a protected class. Failing to indicate a connection to a protected status -- either explicitly or through facts establishing that inference -- is insufficient. *Orton-Bell*, 759 F.3d at 776 (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)) (affirming summary judgment on retaliation claim where plaintiff failed to link

complaint to protected status as a woman, such that complaint could not be basis for retaliation claim); *see also Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007-08 (7th Cir. 2000) (explaining that "[a]n employee, of course, need not use the words 'pregnancy discrimination' to bring her speech within Title VII's retaliation protections. But she has to at least say something to indicate her pregnancy is an issue. An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.").

Accordingly, the issue for purposes of evaluating plaintiff's retaliation claim on summary judgment boils down to "whether [defendants] acted in such a way that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Porter v. City of Chi.*, 700 F.3d 944, 957 (7th Cir. 2012) (quoting *Thompson v. N. Am. Stairless, LP*, 131 S. Ct. 863, 868 (2011)). If plaintiff makes this showing, the burden shifts to defendants to identify a legitimate nondiscriminatory reason for their actions, and if so, then back to plaintiff to show pretext. *See Miller*, 203 F.3d at 1007.

Plaintiff's evidence of retaliation is stronger than that for his discrimination claim given the close timing between: (1) his raising concerns about discrimination and his effective demotion to working with students; (2) his substantially worse disciplinary record following the filing of the ERD complaints; (3) the loss of his ERD claims in state court and his first negative annual review, which certainly contributed to his layoff; and (4) the odd treatment he received in applying for subsequent positions. The court hastens to add that there are other possible explanations for all of those events. For example, while it appears that as soon as defendants believed any risk of exposure for discrimination had

been resolved, defendants felt free to get rid of Balogun, the court does not discount the possibility that this may have been the function of overly cautious legal counsel rather than pent up aggression to get rid of someone having raised discrimination claims. Still, the timing also gives rise to a possible inference that the layoff was the culmination of a series of adverse actions in response to Balogun's repeated questioning as to whether he was being singled out for reasons of race or nation of origin, as well as subsequent, formal complaints.

There is no dispute that plaintiff engaged in protected activity by filing his complaints with the ERD in 2010, nor that being fired and not re-hired are adverse actions.[16] Nevertheless, defendants contend that plaintiff cannot connect these actions to his complaints of discrimination. (Summ. J. Br. (dkt. #28) 39.) The Seventh Circuit has instructed that "causation can be established by circumstantial evidence, which includes, for example, 'suspicious timing, a pretextual explanation for the [adverse action], and evidence that similarly situated employees were treated differently.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (citing *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016)). Here, suspicious timing and oddities in the hiring process provide enough evidence from which a reasonable jury could find retaliation.

To be fair, plaintiff argues that his protected activity encompasses more than simply his ERD complaints. He contends that his "layoff and the Defendants' refusal to re-employ [him] . . . are the culmination of a series of events initiated by Balogun's request to be reclassified in 2009 because the work he performed was the same as his white co-workers

---

[16] Only "post-termination acts of retaliation that have a nexus to employment are actionable under Title VII," such that former employees can sue if they are complaining that retaliation "impinges on their future employment prospects or otherwise has a nexus to employment." *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 888, 891 (7th Cir. 1996).

whose positions had higher classifications." (Opp'n (dkt. #50) 19.) Plaintiff is correct that informal complaints may be protected activity, but his January 8, 2009, request for reclassification was insufficient to put Cherek on notice that he was complaining about national origin or race discrimination. The only information we have about that conversation is that plaintiff went to Cherek's office and told Cherek that the January 7, 2009, email showed that Balogun and Bradley were "doing the same job" so that Balogun's "position should be reclassified," as "Bradley had even asked [Balogun] for help in handling incidents" and Cherek denied the request. (Balogun Decl. (dkt. #35) ¶¶ 39, 42.) Importantly, plaintiff does not contend that he identified race or national origin as an issue. Accordingly, this conversation cannot serve as the basis for a retaliation claim. *See Orton-Bell*, 759 F.3d at 776 ("[A] 'complainant must indicate the discrimination occurred because of [the protected characteristic] . . . . Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.'" (quoting *Tomanovich*, 457 F.3d at 663)).

However, plaintiff *did* later complain about race discrimination. He did so first in July 2009, in response to Cherek removing him from the helpdesk. (*See* Balogun Decl. (dkt. #35) ¶¶ 48-49.) Specifically, plaintiff contends that he "told Cherek he was unfairly targeting [him] because [he] was a minority." (*Id.* ¶ 49.) This informal complaint is sufficient to put Cherek on notice that Balogun was complaining of at least race discrimination. Not long after this exchange, in mid-September 2009, Cherek announced the division between the incident and field services teams, with Balogun being the only non-supervisory, non-student member of the field services team. The closeness in time

between his complaint of racial discrimination and this assignment is suspicious. Likewise, this arguable demotion is the type of action that may dissuade a reasonable person from complaining about discrimination. This may serve as the basis for a retaliation claim.

Similarly, on September 21, 2009, plaintiff met with Cherek and told him that it "seem[ed] racially based" for "the only minority" to be assigned to the field services team. (*Id.* ¶ 59.) According to plaintiff, Cherek told him the decision was not based on race, but that he could see why plaintiff might think so. (*Id.*; *see also* Cherek's Log (dkt. #35-6) 3.) Moreover, it was only after plaintiff was assigned to this group that he began receiving disciplinary actions. He was disciplined on April 27 and July 29, 2010; March 7, 2011, and January 29 and September 12, 2013. Admittedly, a reasonable jury may attribute some or all of these disciplinary actions to plaintiff's displeasure at being placed on the field services team, rather than to his complaints of race discrimination, especially when they are far removed in time from any specific complaint or action. While not actionable by themselves, they may be part of the larger mosaic that built to his eventual layoff as soon as the shadow of plaintiff's ERD complaints were removed.[17] The same may be said for the "race issues" discussion Balogun and Cherek had in early October 2009.

As plaintiff notes, within two days of the Dane County Circuit Court affirming the administrative decisions, Cherek completed the only annual evaluation concluding that plaintiff's overall performance was unsatisfactory. While unlikely to be actionable on its own, that negative evaluation arguably laid the foundation to target Balogun as AIMS's

---

[17] Similarly, if plaintiff is trying to rely on Cherek's purported attempt to demote Balogun to a field service technologist position or to change his job description as the retaliatory act, that fails because plaintiff remained an IS Resource Support Technician Senior throughout his time at UW-Madison. Accordingly, no reasonable jury could find retaliation on these facts alone.

only layoff the following spring.  (*See* Summ. J. Br. (dkt. #28) 32.)  Whether plaintiff was actually meeting his employer's expectations is itself contested, as are the metrics used for making that determination.[18]  Likewise, there are numerous disputes of fact regarding the evaluation's accuracy and the circumstances surrounding its discussion, especially since all of plaintiff's prior evaluations rated his employment as satisfactory, despite receiving a number of disciplinary actions.  The closeness in time between the denial of his discrimination claim and Balogun's negative evaluation is suspicious by itself, but especially so if the jury believes Balogun's testimony that defendant Cherek told him this evaluation would be used against him and his career was over at UW, as well as threatened increased scrutiny, including the concentrated improvement plan.  Under the circumstances, a reasonable jury could conclude that plaintiff's layoff was caused by that retaliatory negative performance evaluation, precipitated by the conclusion of litigation surrounding his ERD complaint, as well as other disciplinary actions that began with the filing of his ERD complaints and placement in a student-only group shortly after first complaining about Cherek's possible discriminatory motivations.

As for the failure to re-hire plaintiff, there are enough disputes of fact -- or at least suspicious oddities -- to warrant a jury trial.  First, defendants' contention that the 96512 job was posted under an incorrect title is suspect because of the necessary review process before its posting.  Specifically, human resources had to approve, validate and post the position, including Owens verifying the job title, organizational structure, and job description.  Likewise, the job title appears to have remained the same throughout the

---

[18] For instance, the parties dispute how customer satisfaction survey results were used to evaluate workers.

recruitment process.

Second, the conclusion that plaintiff lied during his interview for the 96512 position is suspect, at least as to his prior work experience. While there is no dispute that plaintiff had not worked on the helpdesk for a few years at that point, that does not change the fact that he previously had that experience. Likewise, plaintiff's prior performance evaluations arguably recognized that he was handling more complex issues. (*See* 2008 Eval. (dkt. #25-1) 7 ("On occasion, Tony will perform significant tasks without informing/consulting with senior technicians."); 2010 Performance Evaluation (dkt. #25-1) 9 ("[S]ometimes, he waits too long before consulting senior technicians.").) Referring to actual prior experience cannot be the basis for the conclusion that he lied during his telephone interview.[19] As plaintiff noted, he knew the people interviewing so he would have no reason to lie about his experience.

Third, plaintiff disputes the interviewers' other rationale for him not moving forward in the interview process: his alleged lack of communication skills. Plaintiff contends that "[h]e has an accent, but he does not lack communication skills" and that his evaluations predating his complaints about his job classification being the product of discrimination "demonstrate he did not lack communication skills." (Balogun Decl. (dkt. #35) ¶ 155; 2008 Performance Evaluation (dkt. #25-1) 7 ("Tony communicates well with customers and staff.").)

Fourth, during his phone interview, Balogun asked about the process going forward, and Rogers told him that she would contact him by early the following week. When they

---

[19] Similarly, whether Balogun had that experience with AIMS or FP&M seems to be a distinction without difference.

later connected, however, Rogers informed him that human resources would make the hiring decision.  Moreover, on October 12, 2015, Rogers emailed Balogun to say that the review and interview process was taking longer than anticipated.  In fact, by October 4, 2015, the job had already been offered, accepted, and then refused by another candidate. As a result, the position was cancelled, suggesting that Balogun was never considered an acceptable candidate.

Finally, because of the significant overlap in the descriptions for Positions 96512 and 97093, the decision not to interview Balogun is similarly suspect.  (Comparison (dkt. #40-1) 1-3.)  Accordingly, plaintiff may proceed on his claim for retaliation based on these adverse actions as well.

For the reasons addressed above, defendant's motion for summary judgment on plaintiff's retaliation claims will be denied.

ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #22) is DENIED IN PART AND RESERVED IN PART as set forth above.

2) Plaintiff's motion to strike (dkt. #51) is DENIED.

Entered this 28th day of June, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge